ABC, LLC, ET AL. *v.* STATE ETHICS COMMISSION
(SC 16686)

Sullivan, C. J., and Katz, Vertefeuille, Zarella and Moran, Js.

Argued March 21—officially released July 29, 2003

*Eliot D. Prescott,* assistant attorney general, with whom were *Jane R. Rosenberg,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellant (defendant).

*Jeffrey J. Mirman,* with whom was *R. Bartley Halloran,* for the appellees (plaintiffs).

*Opinion*

SULLIVAN, C. J. The defendant, the state ethics commission (commission), appeals[1] from the judgment of the trial court sustaining the plaintiffs'[2] appeal pursuant

[1] The commission appealed from the judgment of the trial court to the Appellate Court, and we granted the commission's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The plaintiffs are Truro Associates, LLC, St. James Associates, LLC, George Finley, John F. Droney and Peter Kelly. At the time that this action was initiated, the trial court, *McWeeny, J.,* granted the plaintiffs' ex parte motion to proceed under fictitious names, namely, ABC, LLC, DEF, LLC, John Doe 1, John Doe 2 and John Doe 3. By order dated October 11, 2000, the trial court, *Satter, J.,* vacated that order. The fictitious names, however, have remained as part of the official case caption.

to General Statutes § 4-183[3] from a declaratory ruling of the commission regarding the scope and application of the Code of Ethics for Lobbyists, General Statutes § 1-91 et seq. We conclude that, because the declaratory ruling was based on hypothetical facts, the plaintiffs were not aggrieved by the commission's ruling within the meaning of § 4-183 and, therefore, the trial court lacked subject matter jurisdiction over the plaintiffs' appeal. Accordingly, we reverse the judgment of the trial court.

The record contains the following relevant facts and procedural history. On November 24, 1999, the plaintiffs, pursuant to General Statutes § 4-176,[4] petitioned the commission for a declaratory ruling on six questions[5] pertaining to the scope and application of General

---

[3] General Statutes § 4-183 (a) provides in relevant part that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[4] General Statutes § 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

[5] Specifically, the plaintiffs requested a ruling on the following issues: "(1) Does Section 1-99 (a) of the Connecticut General Statutes permit imposition of a civil penalty of more than Two Thousand Dollars against a person who (1) knowingly enters into a contingent fee agreement, (2) knows that the activity which is required under the contract is lobbying activity, as defined under Conn. Gen. Stat. Section 1-91, and (3) who further knows that the entering into of the contingent fee agreement violates Section 1-97 (b) of the Connecticut General Statutes?

"(2) Does Section 1-99 (a) of the Connecticut General Statutes permit imposition of a civil penalty of more than Two Thousand Dollars against a person who (1) knows that he is entering into a contingent fee agreement, and (2) (a) knows that the services required are lobbying services as defined under Conn. Gen. Stat. Section 1-91, but (b) does not know that said conduct violates Section 1-97 (b) of the Connecticut General Statutes?

"(3) Does Section 1-99 (a) of the Connecticut General Statutes permit imposition of a civil penalty in excess of Two Thousand Dollars against a person who (a) knowingly enters into a contingent fee agreement (b) did not intend to provide services which would be defined as lobbying services under Conn. Gen. Stat. Section 1-91, (c) did not believe that he was providing

Statutes §§ 1-91 (k),[6] 1-97 (b)[7] and 1-99 (a).[8] At the time, the commission was investigating whether the plaintiffs' conduct in connection with certain contractual transactions involving the plaintiffs, two venture capital investment firms and the state treasurer's office violated the prohibition on contingent fee lobbying set forth in § 1-97 (b). The commission granted the request for a ruling and ordered that a hearing on the petition "be conducted in the course of the first Docket Number regarding the [pending investigations of the plaintiffs]

such services, and (d) did not believe that he was violating Section 1-97 (b), or intend to violate said Section?

"(4) Does Conn. Gen Stat. Section 1-99 (a) permit the imposition of a civil penalty in excess of Two Thousand Dollars for knowingly entering into a contingent fee agreement against anyone other than a party to the contingent fee agreement?

"(5) Does Section 1-99 (a) of the Connecticut General Statutes permit the imposition of a civil penalty of no more than Two Thousand Dollars against a person who enters into a contingent fee agreement without knowing at the time of entering into the agreement that the services called for by the agreement would violate Conn. Gen. Stat. Section 1-97 (b)?

"(6) Does Section 1-99 (a) of the Connecticut General Statutes require that in order for the imposition of a civil penalty in excess of Two Thousand Dollars ($2,000.00) the person entering into a contingent fee agreement within the parameters of Conn. Gen. Stat. Section 1-97 (b) must know that the required services under the contingent fee agreement are lobbying services as defined by Section 1-91 at the time of entering the contingent fee agreement?"

[6] General Statutes § 1-91 (k) provides in relevant part: " 'Lobbying' means communicating directly or soliciting others to communicate with any official . . . in the . . . executive branch of government . . . for the purpose of influencing any . . . administrative action . . . ."

[7] General Statutes § 1-97 (b) provides: "No person shall be employed as a lobbyist for compensation which is contingent upon the outcome of any administrative or legislative action."

[8] General Statutes § 1-99 (a) provides in relevant part: "The commission, upon a finding made pursuant to section 1-93 that there has been a violation of any provision of this part, shall have the authority to order the violator to do any or all of the following . . . (3) pay a civil penalty of not more than two thousand dollars for each violation of this part. . . . The commission may impose a civil penalty on any person who knowingly enters into a contingent fee agreement in violation of subsection (b) of section 1-97 . . . . The civil penalty shall be equal to the amount of compensation which the registrant was required to be paid under the agreement."

to reach the preliminary hearing stage . . . ." By agreement of the parties, however, the facts alleged in the petition and presented at the hearing on the petition were "submitted for the sole purpose of obtaining a Declaratory Ruling, and the resultant Ruling should not be construed as addressing the specific conduct of the [plaintiffs in the transactions then under investigation by the commission]."

The parties stipulated to the following relevant facts for purposes of the declaratory ruling.[9] The plaintiff Truro Associates, LLC (Truro), is a limited liability company formed under the laws of this state. The plaintiff George Finley is Truro's president, and the plaintiffs Peter Kelly and John F. Droney are partners in the company. On August 14, 1997, Truro entered into an agreement with IAI Ventures, Inc. (IAI Ventures), a venture capital firm and the managing member of IAI World Fund, LLC (IAI World Fund). Under the agreement, Truro was obligated to assist IAI Ventures in identifying large financial institutions as potential members of IAI World Fund in exchange for a fee contingent upon the amount of the institution's investment. The agreement prohibited Truro from engaging in any attempt to explain, sell or recommend investment in IAI World Fund.

In September, 1994, Finley sought a legal opinion from Paul McCormick, an attorney, regarding the application of Public Acts 1994, No. 94-69 (P.A. 94-69), to the marketing of services by Crossroads Management Partners, another entity in which Finley had an interest, to the state treasurer's office and its servicing of existing contracts. Public Act 94-69 had amended the statutory

[9] The facts stipulated to by the parties were those set forth in the plaintiffs' petition and the exhibits attached thereto and contained in an affidavit submitted on behalf of the plaintiffs by former Chief Justice John Speziale and in testimony at the hearing on the petition by the plaintiffs' expert witness on ethics, Ralph Elliot.

definition of "administrative action" set forth in General Statutes (Rev. to 1993) § 1-91 (a) to include "any action or nonaction of any executive agency or quasi-public agency, as defined in section 1-79 . . . regarding a contract, grant, award, purchasing agreement, loan, bond certificate, license, permit or any other matter which is within the official jurisdiction or cognizance of such an agency."[10] By letter dated December 27, 1994, McCormick advised Finley that, in his opinion, contacts with the state treasurer's office for the purpose of servicing investment management contracts, renewing existing contracts or selling new services did not constitute lobbying under P.A. 94-69 because those activities were exempted under §§ 1-92-42a through 1-92-42c of the Regulations of Connecticut State Agencies.[11]

Before engaging in any conduct in furtherance of its obligations under the agreement with IAI Ventures, Truro also obtained a legal opinion from Richard Kraut, an attorney and the former assistant director of enforce-

---

[10] General Statutes (Rev. to 1993) § 1-91 (a), as amended by Public Acts 1994, No. 94-69, provides: " 'Administrative action' means any action or nonaction of any executive agency of the state with respect to the proposal, drafting, development, consideration, amendment, adoption or repeal of any rule, regulation or utility rate, *and any action or nonaction of any executive agency or quasi-public agency, as defined in section 1-79, as amended by section 13 of Public Act 93-413, regarding a contract, grant, award, purchasing agreement, loan, bond certificate, license, permit or any other matter which is within the official jurisdiction or cognizance of such an agency.*" (Emphasis added.) The emphasized portion was added by P.A. 94-69.

[11] McCormick wrote that "[i]ncluded in the category of exempt activities [under §§ 1-92-42a through 1-92-42c of the Regulations of Connecticut State Agencies] are: the preparation of submissions required by, or filed pursuant to, statute, regulation, or agency rule (e.g., the preparation of a rate increase submission, permit application or response to a request for contract proposals or otherwise requested by the agency); ordinary and customary communications made to the agency, or related entity, incident to the performance of a contract, implementation of a permit, etc.; communications by a manufacturer's representative or other sales agent if that person is acting solely as a salesperson and does not otherwise engage in lobbying regarding any administrative action."

ment for the Securities and Exchange Commission, concerning Truro's compliance with state and federal securities law. Kraut advised Truro that it could not engage in: (1) the sale, solicitation of offers, or recommendations of a security to an investor; (2) the provision of advice to investors; or (3) negotiations with prospective buyers. He also advised Truro that it could have no involvement in the investments and that any fees received by Truro as a result of its activities must be disclosed to the state treasurer in writing.

In 1997, Finley, on behalf of Truro, inquired of the then state treasurer, Christopher Burnham, whether the treasurer's office would be interested in investing in a venture capital fund. When Burnham indicated his interest in making such an investment, Finley informed him about IAI Ventures and arranged a meeting between Burnham and representatives of IAI Ventures, which Finley also attended. Finley did not engage in any sales conduct with respect to the IAI World Fund and did not explain the investment or negotiate any terms of the state treasurer's investment in the fund. Ultimately, the state treasurer entered into an agreement with IAI Ventures to invest in IAI World Fund. On August 15, 1997, Truro filed with the state treasurer an unsolicited and voluntary disclosure of the type and amount of the fee that it would receive from IAI Ventures if the state invested in IAI World Fund.

The plaintiff St. James Associates, LLC (St. James), is a limited liability company formed under the laws of this state. Finley is St. James' president and Droney is a partner in the company. On October 15, 1998, St. James entered into an agreement with Crescendo Ventures III, LLC, and Crescendo Venture Management, LLC (jointly, Crescendo), concerning the Crescendo III, LP Fund (Crescendo Fund). The terms of the agreement were virtually identical to the terms of the agreement between Truro and IAI Ventures.

After entering into the agreement, Finley and Droney inquired of the then state treasurer, Paul Silvester, whether the treasurer's office would be interested in investing in the Crescendo Fund. When Silvester indicated his interest in making such an investment, Finley and Droney arranged a meeting between Silvester and representatives of Crescendo. Ultimately, the state treasurer entered into an agreement with Crescendo to invest in the Crescendo Fund. Finley and Droney did not engage in any sales conduct with respect to the Crescendo Fund and did not explain the investment or negotiate any terms of the state treasurer's investment in the fund. On October 13, 1998, St. James filed with the state treasurer an unsolicited and voluntary disclosure of the type and amount of the fee that it would receive from Crescendo if the state invested in the Crescendo Fund.

On the basis of these facts, the commission issued a declaratory ruling that the conduct described in the petition constituted "lobbying" within the meaning of § 1-91 (k). It also concluded that, for the commission to impose a civil penalty "equal to the amount of compensation which the registrant was required to be paid"; General Statutes § 1-99 (a); two findings would be required: (1) that the person knowingly entered into a contingent fee agreement; and (2) that the agreement was in violation of § 1-97 (b). It rejected the plaintiffs' argument that, in order to impose the penalty, the commission must find that the person knowingly violated § 1-97 (b).[12] Finally, addressing the plaintiffs' fourth

---

[12] Accordingly, the commission answered the plaintiffs' questions one, two, three, five and six; see footnote 5 of this opinion; as follows:

"1. Yes.

"2. Yes, if the agreement in fact violates § 1-97 (b).

"3. Yes, if the agreement in fact violates § 1-97 (b).

"5. No. The § 1-99 (a) civil penalty is not limited to two thousand dollars if the agreement, in fact, violates § 1-97 (b).

"6. No. The only 'knowingly' requirement for imposition of the § 1-99 (a) penalty is that the person 'knowingly enters into a contingent fee agreement.' "

question; see footnote 5 of this opinion; the commission concluded that the forfeiture penalty could be imposed against the individual lobbyists as well as the limited liability corporations.

The plaintiffs appealed from the commission's declaratory ruling to the trial court pursuant to § 4-183. In its decision, the trial court noted that, "[b]y agreement of the parties, the facts which formed the basis of the declaratory ruling were to be hypothetical and were not investigated or corroborated by the commission." It also determined, as a preliminary matter, that the plaintiffs were aggrieved by the commission's ruling. The court specifically noted that the commission had not contested that the plaintiffs had "a specific personal and legal interest that has been specially and injuriously affected by the decision of the commission."[13]

In a thoughtful and comprehensive analysis of the merits of the plaintiffs' appeal, the trial court first found that the hypothetical conduct described in the plaintiffs' petition did not constitute lobbying because it did not constitute "communicating directly . . . with any official or his staff in the . . . executive branch of government . . . for the purpose of influencing any . . . administrative action . . . ." General Statutes § 1-91 (k). The court reasoned that "communicating for the purpose of influencing" required an "evaluative or qualitative statement in favor of the administrative action." It also concluded that the conduct came under the exception to § 1-91 (k) set forth in § 1-92-42a (e) (3) of

---

[13] The following exchange took place at the hearing on the administrative appeal:

"[Counsel for the plaintiffs]: At the outset, Your Honor, as I understand it from a prior discussion I had with [counsel for the commission], the commission has stipulated or will stipulate to the facts necessary to establish aggrievement for the purposes of an administrative appeal.

"[Counsel for the commission]: That's not precisely what I said, but I'm not—I'm not disputing aggrievement. I'm not stipulating as to any facts, I'm just not contesting aggrievement."

the Regulations of Connecticut State Agencies, which provides that "contacts with an executive branch or quasi-public agency, whether formal or informal, for informational purposes . . . regardless of whether the contact is initiated by the private party or the agency" do not constitute lobbying. Moreover, the court noted that the legislature recently had passed Public Acts 2000, No. 00-43, now codified, as further amended, as General Statutes § 3-13*l*, which prohibits receipt of "a finder's fee in connection with any investment transaction involving the state . . . ." General Statutes § 3-13*l* (a). The court concluded that the statute would prohibit the hypothetical conduct described in the plaintiffs' petition and that, by passing the legislation, the legislature implicitly recognized that the preamendment legislation did not contain such a prohibition.

The court then turned to the commission's responses to the six questions posed by the plaintiffs in their petition. See footnote 5 of this opinion. The court concluded that, contrary to the commission's ruling, § 1-99 (a) requires that a person knowingly violate § 1-97 (b) before the statute's forfeiture penalty may be imposed. Accordingly, it reversed the commission's rulings on questions two, three, five and six, answering questions two, three and five in the negative and question six in the affirmative. The court also answered question four in the negative, concluding that only the limited liability corporations were parties to the contingency fee agreements and, therefore, the individuals could not be subjected to the forfeiture penalty. Accordingly, the trial court sustained the plaintiffs' appeal.

The commission appealed from the trial court's decision, claiming that the trial court improperly: (1) had failed to accord proper deference to the commission's ruling or to consider all relevant evidence in the record before it; (2) had concluded that the described conduct did not constitute lobbying; (3) had concluded that the

commission may not impose a civil penalty on a person who enters into a contingent fee contract unless the person knows that the conduct violates § 1-97 (b); and (4) had concluded that the commission may not impose a civil penalty on an individual who is not a signatory to the contingent fee agreement. After briefs had been filed in this appeal and the case had been transferred, this court, sua sponte, requested supplemental briefs addressing the following two questions: (1) whether the appeal should be dismissed as moot where it appears that the related administrative actions have been settled and therefore that there is no actual controversy between the parties and that the interests of the parties are no longer adverse; and (2) whether the plaintiffs were aggrieved for purposes of an appeal pursuant to § 4-183 where the declaratory ruling was based on hypothetical facts. In its response to the second question, the commission, despite its statement to the trial court that it did not contest aggrievement, argued that the trial court lacked subject matter jurisdiction over the plaintiffs' appeal because the plaintiffs were not aggrieved by the commission's declaratory ruling. We agree with this belated insight of the commission and, accordingly, reverse the judgment of the trial court. Because our resolution of this issue is dispositive of the appeal, we do not reach the other claims raised by the commission.

As a threshold matter, we set forth the appropriate standard of review. "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Doe* v. *Roe*, 246 Conn. 652, 660, 717 A.2d 706 (1998). "This court has often stated that the question of subject matter jurisdiction, because

it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, at any time. . . . Moreover, [t]he parties cannot confer subject matter jurisdiction on the court, either by waiver or by consent." (Citations omitted; internal quotation marks omitted.) *Webster Bank* v. *Zak*, 259 Conn. 766, 774, 792 A.2d 66 (2002).

The plaintiffs' right to appeal from the commission's declaratory ruling is created by § 4-183 (a), which provides in relevant part that "[a] person who has exhausted all administrative remedies available within the agency *and who is aggrieved* by a final decision may appeal to the Superior Court as provided in this section. . . ." (Emphasis added.) "Accordingly, in order to have standing to bring an administrative appeal, a person or entity must be aggrieved. . . . Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact. . . . Pleading and proof of facts that constitute aggrievement are essential prerequisites to the trial court's subject matter jurisdiction over an administrative appeal. . . . In the absence of aggrievement, an administrative appeal must be dismissed for lack of subject matter jurisdiction. . . .

"The test for determining aggrievement is a two part inquiry: [F]irst, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision." (Citations omitted; internal quotation marks omitted.) *Water Pollution Control Authority* v. *Keeney*, 234 Conn. 488, 493–94, 662 A.2d 124 (1995). "Aggrievement is established if there is a possibility, as

distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Orange*, 256 Conn. 557, 568, 775 A.2d 284 (2001). "To satisfy the aggrievement requirement of [§] 4-183 (a) . . . the plaintiffs must allege a legally protected interest that is concrete and actual, not merely one that is hypothetical." *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, 226 Conn. 105, 127, 627 A.2d 1257 (1993).

Although the legal concepts of standing, mootness and aggrievement are not identical, they are "founded on the same policy interests . . . namely, to assure the vigorous presentation of arguments concerning the matter at issue.[14] . . . This court recently reiterated that the standing doctrine is designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . [*State* v. *McElveen*, 261 Conn. 198, 204, 802 A.2d 74 (2002).] Indeed, we note that courts are called upon to determine existing controversies, and thus may not be used as a vehicle to obtain advisory judicial opinions on points of law." (Internal quotation marks omitted.) *Wallingford* v. *Dept. of Public Health*, 262 Conn. 758, 767, 817 A.2d 644 (2003). " 'Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination

---

[14] See also *Gladysz* v. *Planning & Zoning Commission*, 256 Conn. 249, 255, 773 A.2d 300 (2001) (legal concepts of standing and aggrievement are similar but not identical).

of the controversy will result in practical relief to the complainant.' " *State* v. *McElveen*, supra, 204.

The plaintiffs claim that the facts relied on by the commission were not hypothetical and that they were aggrieved by the commission's declaratory ruling. In support of this claim, they point to the commission's statement that the ruling was "predicated solely upon the facts set forth in the Request for the Declaratory Ruling, the exhibits introduced and the testimony provided. It is the intention of the parties that these facts and information are submitted for the sole purpose of obtaining a Declaratory Ruling, and the resultant Ruling should not be construed as addressing the specific conduct of the Respondents in [the pending investigations against them]. Said conduct will be judged in subsequent hearings on the merits conducted pursuant to [General Statutes] § 1-93." The plaintiffs argue that this language shows that "[t]he facts as set forth in the request, and as found by the trial court, are real; they were just not subject to preclusive effect" in the enforcement actions. The plaintiffs also claim, however, that "[t]he [commission's] interpretation of the Code of Ethics would no doubt have served to influence the decision in those pending charges." Finally, the plaintiffs argue that they had "a specific personal and legal interest in the subject matter of the decision . . . [which] has been specially and injuriously affected by the decision"; (internal quotation marks omitted) *Water Pollution Control Authority* v. *Keeney*, supra, 234 Conn. 494; because the ruling jeopardized their respective good reputations.

Thus, the plaintiffs simultaneously claim that the facts relied on by the commission in reaching its declaratory ruling represented a "real" account of the plaintiffs' actual past conduct, that the ruling did not have preclusive effect in the ongoing enforcement actions, and that the ruling necessarily would influence the out-

come of the those actions and adversely affect their reputations. We cannot reconcile these contradictory claims. The plaintiffs cannot seek a ruling on the applicability of the relevant statutes to a limited set of self-selected facts, expressly decline to be legally bound by the ruling in the context of any real-world controversy, and then claim that they are aggrieved by the ruling because the facts are "real" and the ruling affects their concrete and actual interests. Regardless of whether the facts relied on by the commission were "real" in the sense that they were not invented, the record establishes that those facts did not constitute a comprehensive account of the plaintiffs' actual conduct and circumstances that was the result of a truth seeking, adversarial fact-finding process, and that would be binding in other legal controversies involving the same facts. Therefore, for the purposes of the declaratory ruling, the facts were hypothetical.

Indeed, counsel for the commission stated repeatedly at oral argument before the trial court on the merits of the administrative appeal that the declaratory ruling had been based on hypothetical facts and that "the real-world facts that are discovered, that are fleshed out in the probable cause investigation of the commission, may be different than these hypothetical facts. These [facts] are not the real world. This may not be what happened. There may be additional facts that are relevant." Counsel for the plaintiffs did not dispute this characterization of the record before the commission, but, in support of his request to introduce additional evidence favoring the plaintiffs that was not contained in that record, argued that the facts underlying the ruling "cannot be separated from the real-world facts because, as the commission has conceded, if this conduct as described is not lobbying, then no penalty may be assessed." The parties had stipulated, however, that the ruling would have no preclusive effect in the

enforcement proceedings precisely *because* the conduct as described in the record was not an accurate and comprehensive account of the plaintiffs' actual conduct.[15]

If the facts presented to the commission were not "real" for the purposes of the enforcement proceedings, then they were not "real" for the purposes of the declaratory ruling. The law, as a general rule, does not countenance parallel realities. This principle underlies both the aggrievement requirement for the existence of an actual controversy and the doctrines of collateral estoppel and res judicata. Under those doctrines, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton,* 262 Conn. 45, 58, 808 A.2d 1107 (2002). The doctrines "embod[y] a judicial policy in favor of judicial economy, the stability of former judgments and finality." (Internal quotation marks omitted.) Id. The integrity of the judicial system would be undermined by allowing a party to claim aggrievement on the ground that the facts underlying his claim are "real,"

---

[15] We note that the trial court, *Hon. Robert Satter,* judge trial referee, in its ruling on the plaintiffs' motion for a stay of the commission's ruling pending resolution of the administrative appeal, held that "as long as facts found in the probable cause investigation by the commission are substantially the same as the hypothetical facts presented for the declaratory ruling, the commission is stayed from using its declaratory ruling as the basis for a finding of probable cause." Thus, the trial court properly recognized that, to the extent that the facts relied on by the commission in reaching its ruling were "real," the decision on the appeal necessarily would have precedential value in the enforcement actions. The court also noted, however, that "[t]he investigation may reveal facts that differ from the hypothetical facts on the basis of which the declaratory ruling was made. Thus, the plaintiffs have failed to establish the requisite likelihood they will prevail [in the enforcement actions]." Accordingly, the court denied the request for a stay of the enforcement actions pending resolution of the administrative appeal.

but to avoid the strictures of the collateral estoppel and res judicata doctrines by asserting that those facts are "real" *only* for the purposes of the current claim.

The plaintiffs argue, however, that the commission "should not be permitted to subvert the legislatively created process for seeking declaratory rulings by consolidating a request with another matter and then asserting the facts contained in the request to be hypothetical." It was not the consolidation of the petition for a declaratory ruling with the enforcement actions— to the limited extent that that appears to have occurred—however, that rendered the facts of this case hypothetical. To the contrary, the facts were rendered hypothetical by the plaintiffs' choice *not* to litigate the nature and legality of their conduct within the context of the enforcement proceedings, but, instead, to seek a declaratory ruling in a separate proceeding, based on a limited record that was not the result of a truth seeking, adversarial, fact-finding process.[16]

We emphasize that we do not decide in this case whether a person may be aggrieved by an agency's declaratory ruling on the applicability of a statute to purely hypothetical, *but actually intended*, future conduct, when the ruling was requested for the purpose of providing guidance to the person requesting the ruling.[17] There is no claim that that was the purpose of the plaintiffs' request in the present case. We conclude only

[16] This is not to suggest that parties cannot stipulate to the facts. It is to suggest, however, that they cannot stipulate to the facts for a limited purpose. If the facts underlying a declaratory ruling are not agreed to be the "real" facts for *all* relevant legal purposes, then they are hypothetical.

[17] In the present case, for example, if the plaintiffs had sought a declaratory ruling *before* engaging in the conduct that was the subject of the enforcement actions, it is entirely possible that they would have been aggrieved by the injunctive effect of an adverse ruling. For reasons that do not appear in the record, however, the plaintiffs chose not to request such a ruling but, instead, relied on the advice provided by Finley's counsel in a different, but related, matter.

that, when a declaratory ruling relates to *past* conduct, if the ruling is not predicated on an understanding that the facts in the record are "real" for *all* relevant legal purposes, then the facts are not "real" for purposes of the ruling.

The purpose of the aggrievement requirement is to ensure that "courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy . . . ." (Internal quotation marks omitted.) *Wallingford* v. *Dept. of Public Health,* supra, 262 Conn. 767. The plaintiffs in the present case may have had a concrete and actual interest in obtaining a ruling that § 1-99 (a) did not apply to their conduct, but a legal ruling that was based on hypothetical facts that were not "forged in hot controversy" and that was not binding on the plaintiffs in other legal proceedings involving the same facts could not vindicate that interest. Accordingly, the plaintiffs were not aggrieved by the commission's declaratory ruling within the meaning of § 4-183, and the trial court lacked subject matter jurisdiction over the plaintiffs' appeal.

The judgment is reversed and the case is remanded with direction to dismiss the plaintiffs' appeal.

In this opinion the other justices concurred.